WILLIAM J. LARNED, Respondent, *v.* THE CITY OF SYRACUSE, JACOB AMOS, as Mayor of the City of Syracuse, HENRY F. STEPHENS, as City Clerk of the City of Syracuse, EUGENE A. HOMER and Others, Appellants.

*City of Syracuse — a contract requiring the work of paving a street in that city to be done with brick furnished by a particular company — it is void as stifling competition — taxpayer's action for waste of public funds.*

In an action by a taxpayer of the city of Syracuse to restrain officers of that city from entering into a certain contract for the paving of a city street, it appeared that the charter of the city of Syracuse required that a public improvement, such as the paving of a street, involving an expenditure exceeding seventy-five dollars, be done by contract to be let to the lowest bidder, and that the

contract in question and the petition, resolution of the common council, notice to contractors and specifications filed all required the paving to be done with vitrified paving brick manufactured by the New York Brick and Paving Company of Syracuse, provided the brick be furnished by that company to the contractor at a price not to exceed eleven dollars per thousand.

It was undisputed that several parties made vitrified paving brick equal in quality to the best quality of paving brick manufactured by the New York Brick and Paving Company.

*Held,* that the contract was void for the reason that the clause in question did not permit of the free competition contemplated by the terms of the charter;

That the action would lie, although no claim was made that the brick in question were not as good as any that could be had, or that the price was too high, or that the common council had any evil motive in conducting the proceedings in the form adopted.

APPEAL by the defendants, Eugene A. Homer and others, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Onondaga on the 31st day of December, 1895, upon the decision of the court rendered after a trial at the Onondaga Special Term; also an appeal by the defendants, The City of Syracuse and others, from the amended judgment entered in said clerk's office on the 9th day of May, 1896.

The action was a taxpayer's action to prevent waste of the public funds by restraining the city of Syracuse and its officers from entering into a contract with certain defendants, composing the firm of Homer & Co., for the laying of a pavement in a part of Plum street in the city of Syracuse, upon the ground that the proceedings of the common council of said city were in violation of the charter, and that on this account the expense of the proposed improvement could not be assessed and collected locally, but would have to be thrown upon the taxpayers of the city at large. The judgment restrained the defendants from contracting for the paving of a portion of Plum street in the city of Syracuse, and the decision of the court separately stated the facts found and the conclusions of law.

*Charles E. Ide,* for the city of Syracuse and others, appellants.

*E. J. Page,* for Eugene A. Homer, James M. Homer and Francis E. Van Campen, appellants.

*William Nottingham,* for the respondent.

FOLLETT, J.:

This action was begun October 25, 1894, by a taxpayer of the city of Syracuse to restrain the defendants from contracting for paving that portion of Plum street between the north line of Park avenue and the south line of Belden avenue, except the intersection of West Genesee street.

The city of Syracuse, its mayor and clerk joined in an answer, and the defendants Eugene A. Homer, James M. Homer and Francis E. Van Camp (constituting the firm of Homer & Co.) answered together.

This case arose under the sections of the charter of the city of Syracuse, quoted in *Smith* v. *The City of Syracuse* (*post*, p. 63). The petition by which these proceedings were initiated asked the common council: " To order the paving of Plum St. from the north line of Park Ave. to the south line of Belden Ave., except the intersection of West Genesee St., with vitrified paving brick for the driveway or surface manufactured by the New York Brick & Paving Company of Syracuse, N. Y., provided that said brick be furnished by the said N. Y. B. & P. Co. to the contractor or contractors for said work at a price not to exceed $11.00 per thousand at the Brick Company Works. If not furnished by said Brick Co. at said price, or if for any reason said company cannot or will not furnish said brick, then with any vitrified paving brick equal in quality to the best quality of paving brick manufactured by said N. Y. Brick & Paving Co., upon condition, however, the street be narrowed to 28 feet between the curbs."

The resolution of the common council ordering the paving followed the terms of the petition, and so did the advertisement for proposals ; the proposals followed the language of the petition and resolution, and the contract, which was signed by Homer & Co., the accepted bidders, contained the same provision in respect to the kind of brick to be used and the price to be paid therefor. The learned Special Term held that the proceedings were void because they restricted the contractors to the purchase of brick of a single corporation, provided it would furnish them at not exceeding $11 per 1,000, thereby preventing free competition, as provided by the charter of the city of Syracuse. In this judgment we concur. By the terms of the petition, resolution of the common

council, notice to contractors, specifications filed and contract, it was provided, in effect, that the brick should be purchased of the New York Brick and Paving Company, provided it would furnish them for not more than $11 per 1,000, though the same brick, or brick equal in quality, might perhaps have been purchased of other dealers at a less sum. The provision in this case is quite different from the one in *Smith's* case, which did not provide that the brick should be purchased of a particular firm, but that the brick used should be manufactured by the New York Brick and Paving Company; but it did not provide that they should be purchased of that company, provided they could be purchased at a price fixed.

The general manager of the New York Brick and Paving Company of Syracuse, N. Y., testified that $11 per 1,000 was the regular price for brick when sold in quantities of 100,000 or more, and that it required 200,000 to do the work called for. The effect of these proceedings was to require the contractor to pay the New York Brick and Paving Company its regular price for paving bricks.

The judgment should be affirmed, with costs, upon the opinion of the Special Term.

All concurred.

Judgment affirmed, with costs, on the opinion of VANN, J., delivered at Special Term.

The following is the opinion of VANN, J. :

VANN, J. :

This controversy had its origin in an effort to pave a part of Plum street in the city of Syracuse. The proceedings were initiated in May, 1894, by the petition of two abutting owners, who owned the requisite frontage to confer jurisdiction upon the common council, although they were but a small minority of those who were to pay for the proposed improvement. The petition asked for the pavement of that part of Plum street lying between the north line of Park street and the south line of Belden avenue, except the intersection of West Genesee street. It was in the usual form, except that it called for a pavement of " vitrified paving brick for the driveway

or surface, manufactured by the New York Brick & Paving Company, * * * provided that said brick be furnished by the said N. Y. B. & P. Co. to the contractor or contractors for said work at a price not to exceed $11.00 per thousand at the Brick Company Works. If not furnished by said Brick Co. at said price, or if, for any reason, said company cannot or will not furnish said brick, then with any vitrified paving brick equal in quality to the best quality of paving brick manufactured by said N. Y. Brick & Paving Co."

The usual proceedings were taken by the common council to pave said street in accordance with the terms of said petition. The resolution declaring the intention to pave, the advertisement for proposals, the notice to contractors, the blank forms provided for the making of bids and the proposed contract authorized by the common council, all contained the same condition in relation to the kind of brick to be used, in the precise words quoted above from the petition. The specifications of the city engineer provided that " the surface bricks to be used upon this work shall be of the best quality of vitrified paving bricks, manufactured by the New York Brick and Paving Company of Syracuse, N. Y.; said company agrees to furnish the contractor with such bricks at a price not to exceed eleven ($11.00) dollars per thousand at the brick company's works, located at the intersection of Emerson avenue and Seventh North street, in the tenth ward of the City of Syracuse. If the said bricks are not furnished by said company at said price, or if, for any reason, the said company cannot or will not furnish said bricks, the contractor will immediately notify the Commissioner of Public Works in writing." The proposed contract, however, into which the specifications are literally incorporated, uses the language of the petition, as already set forth, in describing the kind of brick required for the pavement. Two bids were presented for the proposed improvement, one by Homer & Co., at $7,842, and the other by George D. Grannis, at $8,346. The common council accepted the former, and on the 1st of August, 1894, ordered that a contract be entered into accordingly.

The mayor and clerk do not appear to have signed the contract, but it has been duly signed by the contractors, and sureties for the faithful performance thereof have been furnished by them. It is not contended that the proceedings of the city and its officers are unlawful, or in any respect irregular, except as to the requirement

respecting the kind of brick to be used, which is the only subject of controversy in this action.

Upon the trial some evidence was given, outside of the record of proceedings, that is claimed to have a bearing upon the question involved. The city engineer testified that, in order to intelligently prepare the specifications, he asked the manager of the New York Brick and Paving Company for a statement that his company would furnish all contractors with its brick at $11 per 1,000, and that such a statement was furnished accordingly, and was made known to proposed bidders. The statement, however, was not in a form to be binding upon the brick company, at least until acted upon, and then only by way of estoppel.

The manager of said company testified that, although it was organized for the purpose of paving, as well as manufacturing, it had done no paving, and had never been interested in any paving contract; that the market price of their best paving brick, in quantities sufficient for paving purposes, was $11 per 1,000, and had been during 1893 and 1894, but in 1892 it was $10; that there never was any rebate or secret price for their paving brick, and that none of their customers had any pecuniary advantage over any other in dealing with the brick company; that only one firm, John M. Mack & Co., had ever laid any of their brick in the city of Syracuse, and that there are a number of concerns in the country that manufacture vitrified brick of good quality for paving purposes. All the proceedings, including the petition and resolutions, recognize the fact, which was not disputed, that several parties make "vitrified paving brick equal in quality to the best quality of paving brick manufactured by said N. Y. Brick & Paving Company."

The city charter requires a public improvement of the kind in question to "be done by contract if it shall involve an expenditure exceeding seventy-five dollars, and such contract shall be let to the lowest bidder." (Laws of 1888, chap. 449, amending the City Charter [Laws of 1885, chap. 26], § 155.) This provision seems to apply exclusively to the construction of pavements, sewers and work of like character provided for in sections 138 to 154, which are referred to in section 155 as "the foregoing sections," and the anti-monopoly clause of section 155 purports to apply to them only. All the sections occur in title 9,

which is headed "Local Assessments and Improvements." There is another anti-monopoly provision in title 14, headed "City Expenditures," which is apparently general in its application, with one very important exception, and that is, that it does not apply except when work is to be done or materials furnished, "the nature of which will admit of competition." (§ 233.) The difference in the language of the two provisions is suggestive. Why should the Legislature enact two anti-monopoly clauses and apply one to such local improvements as are to be paid for by local assessments, without making any exception whatever, and apply the other to such general improvements or expenditures as are to be paid for by general assessments? Clearly the intention must have been to make the rule absolute in the one case, and, to a certain extent, flexible in the other. The command of the statute seems to be, "as to local improvements let there be no exception; as to other improvements let there be only this exception, that where competition is impracticable the clause need not apply." No latitude is left to the common council, therefore, in laying a pavement that is to be paid for by the abutting owners, for there must be opportunity for competition or the work cannot be lawfully done. The law is so written and the court must declare it accordingly. As to such improvements as are not to be paid for by local taxation the Legislature allows the common council to proceed, without giving opportunity for competition, where the nature of the work will not admit of competition. I gave effect to this distinction in deciding the recent case of *Brady* v. *The City*,* by holding that where a franchise was required to erect poles in the street for the support of wires to conduct electricity, it was confided to the sound judgment and discretion of the common council to decide whether they would allow competition in lighting the streets by electricity or not, and that it was in their power to determine that the evil of erecting a multitude of poles by rival companies was so great as to exclude the subject from competition. That decision has no application to this action, unless it is to contrast the two cases and emphasize the difference between them. In the one there is the positive mandate of the Legislature to lay no pavement without a chance to compete, while in the other leave is given to proceed without

---

* Decided at Special Term by VANN, J., and not reported.— [REP.

calling for bids where competition is impracticable. In the pavement of streets the law relative to the city of Syracuse is that competition must be allowed, and the question now presented for decision is whether proceedings to pave which confine the paving material to such as is made by a single manufacturer, provided it is furnished to all at a price named, come within the comdemnation of the statute, when other manufacturers make the same paving material, and it does not appear whether they sell it any cheaper or not. While, from one point of view, it may be desirable in making a public improvement to call for materials made by a certain person on account of their high standard of excellence, the question at once arises whether such a course is within the spirit of the law governing the subject of monopoly. Even for a desirable purpose it will not do to open the door so wide that the careless or dishonest may enter and evade the statute or subvert its purpose in the name of public utility. If all men were honest there would be need of few laws, but the experience of all cities shows that fraud sometimes enters into municipal contracts, and the object of the statute under consideration is to prevent favoritism, which is one of the most insidious and dangerous kinds of fraud. While in the case in hand no claim is made that the brick are not as good as can be had, or that the price is too high, or that the common council had any evil motive in conducting the proceedings in the form adopted, still it is insisted, and not without force, that the tendency is toward favoritism and fraud, and that the precedent, if allowed to stand, will be loose, dangerous and opposed to the best interests of the city. While competition was allowed to a certain extent in this case, it was not allowed to the extent required by the statute, which contemplates full and free competition in all things. Clearly there could be no competition in the price of paving brick, which is an element that enters largely into the price of brick pavements. If there were manufacturers, other than the one named in the proceedings, who were ready to furnish equally good brick at a less price, they would not be permitted to do so on account of the iron-clad restriction in the petition, resolution and specifications. This is of the very essence of monopoly, which, as defined by Lord COKE, is where the sale of any merchandise or commodity is restrained to one, or to a certain number, and the learned reporter adds that it has three inseparable

consequences — the increase of the price, the badness of the wares and the impoverishment of others. (*The Case of Monopolies*, 11 Coke, 84, 86.) The effect of the action of the common council was in substance to prohibit the use of all brick in paving Plum street, except that made by one corporation, or, in other words, to restrict the sale of brick, for the purpose of paving that street, to the company named. While the price could not exceed $11 per 1,000, no bidder could offer to pave with as good brick procured at any price from another source. No brickmaker, having confidence in the quality of his brick and anxious to introduce it by lowering the price so as to induce purchases, could prevail upon a bidder to propose to pave with his brick, because all other brick, at any price, was positively excluded from use on that street. The necessary tendency was to keep up prices, in violation not only of the statute, but of sound public policy. (*Boon* v. *City of Utica*, 5 Misc. Rep. 391, 392; *People* v. *North River Sugar Refining Co.*, 22 Abb. N. C. 164.) If competition in brick can be thus restricted, the same rule can be applied to lime, labor and whatever enters into the cost of constructing a pavement. Bids might call for brick manufactured by A., lime made by B., broken stone furnished by C., and labor performed by D., all, however, at prices named, and thus favoritism be allowed to permeate the entire contract. Argument is hardly needed to show that this is not competition or a letting to the lowest bidder in the sense meant by the statute. The object of the statute is to keep prices down to reasonable rates, and when this is taken into account, it is clear that it was the intention of the Legislature that bidders should be unhampered by any restriction whatever, except the specifications regulating the amount and quality of the labor and materials; that bidders should be allowed to buy where they can buy cheapest, so that they can bid lower than if compelled to buy of one company, and that competition should extend to one part of the contract as much as another. Due effect can be given to the statute by no other construction. It is not a letting to the lowest bidder if the bidders' hands are tied so that freedom in bidding is impossible. While, in this case, the contract was awarded to the lowest of those who bid, what assurance is there that, but for the restriction as to brick, other bids would not have been made and at lower figures? The tendency of the restriction was to

keep prices up, while the object of the Legislature was to keep prices down. The phrase "lowest bidder," as used in the statute, implies that bidders are not to be shackled when making their bids, or be bound to patronize one concern only. Under the proceedings in question a man could not use his own brick, even if it was the best in the market, because the common council had ordered him to buy of another. Could such a man bid as low as he otherwise would? Could he not save the manufacturer's profit at least if he was unfettered when he made his bid? Of what avail is the command of the statute, to let to the lowest bidder, if the common council may hamper bidders by compelling them to buy their materials of a particular person at a specified price? Such a course does not invite competition, but repels it. The result is that the lowest bidder is higher than he otherwise might be and the object of the statute is defeated.

I think that the proceedings from the petition onward were illegal and void, because they were in violation of the spirit of the law and tended to raise prices and oppress the taxpayer.

Justice to the city authorities compels me to add that, while the courts uniformly recognize the principle governing the subject of competition, they differ somewhat in applying the principle to practice. I have tried to follow the weight of authority, but even the slight confusion that exists in the adjudged cases must be embarrassing to the officers of the city, and it suggests the most cautious method of procedure until the final rule of action is laid down by the highest court.

Findings and a decree for a perpetual injunction against the defendants may be prepared, and, if not agreed to as to form, settled upon a notice of two days.